UNITED STATES OF AMERICA,

        Plaintiff,

    v.                           Case No. 26-CR-94

SAMUEL STAIR,

        Defendant.

## UNITED STATES' OPPOSITION TO DEFENDANT'S
## MOTION FOR PRETRIAL RELEASE

The defendant, Samuel Stair, took advantage of his wealth and status to operate and support multiple drug-trafficking organizations (DTOs) distributing deadly poison throughout the County of Milwaukee. Using his real estate business as a cover and to evade detection, Defendant engaged in dangerous conduct, interfered with police investigations, and solicited violence. Warnings about federal investigations, the execution of numerous search warrants at his properties, and the arrest of multiple co-conspirators was insufficient to deter Defendant. He was also wholly undeterred by overdoses at his properties and even by his ultimate arrest in the instant matter, after which he told associates with whom he was held that the charges would be "good for the show."[1] Indeed, even while he's been incarcerated, his unlawful activity has continued. He's been recorded identifying and sharing possible government witness information with others, has discussed "taking care" of other co-defendants, including providing them residences, has given money to co-defendants in custody with him, and has utilized co-defendant's Personal Identifying Numbers (PINs) to avoid law enforcement listening to his calls.

---

[1] Law enforcement agents believe this was a reference to the American Slumlord Pilot on which Stair and his business was featured. https://www.youtube.com/watch?v=yd1f8MzdGs0

Defendant's conduct post-arrest displays the same brazen disregard for both the law and the safety of the community as he exhibited when he was running his drug-trafficking enterprise. Judge Nancy Joseph, with the benefit of significant knowledge of the evidence gathered during the investigation engaged in a careful and detailed application of the Bail Reform Act and concluded that detention was necessary. Given Defendant's conduct, the 10-year mandatory minimum he faces, and his willingness to use his money and status to engage in dangerous drug trafficking and violence, there is no set of conditions that could reasonably ensure the safety of the community if Defendant is released. The Government, therefore, respectfully requests that this Court continue his detention as ordered by Judge Joseph.

## I.       Legal Standard

A defendant may file a motion seeking review of a detention order after they have been "ordered detained by a magistrate judge[.]"  18 U.S.C. § 3145(b). A "district court reviews a magistrate judge's detention ruling independently." *United States v. McElroy*, 2025 WL 1907292, *1 (July 10, 2025). In conducting its review a court may "start from scratch," or rely on the existing record.[2] *United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991). In this case, that existing record is extensive. It includes: (1) the Criminal Complaint filed at ECF 103, Judge Joseph's written detention order (ECF 77), and the transcript of the detention order (120, attached hereto as Exh. A).

---

[2] This Court has set a hearing for May 19, 2026. The parties have conferred and intend to proceed consistently with local practice via attorney proffer and argument, rather than witness testimony. To the extent the Court prefers to decide the matter on the briefs, the Government does not object.

*A. Burden of Proof*

Detention is appropriate if the Court finds that there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). A finding of either flight risk or danger to the community is sufficient to detain a defendant. *United States v. Daniels*, 772 F.2d 382, 383 (7th Cir. 1985). In making its determination, a court must consider (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves narcotics; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

Certain offenses, including violation of the Controlled Substances Act that carry a maximum term of imprisonment of ten years or more, carry a rebuttable presumption of detention. 18 U.S.C. § 3142(e)(3). "The presumption shifts the burden of production to the defendant to come forward with some evidence that he will not flee or endanger the community." *United States v. McElroy*, 2025 WL 1907292, *1 (July 10, 2025) (citing *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985)). A defendant can meet that burden by presenting any favorable evidence within a category listed in §3142(g). *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). But even if Defendant rebuts the presumption, the presumption remains as "an evidentiary finding militating against release." *Id.* When it comes to detention based on community safety, the government bears the burden of persuasion and "must prove danger by clear and convincing evidence." *United States v. McElroy*, 2025 WL 1907292, *1 (July 10, 2025) (citing cases).

## II.    Background

### A. Procedural History

On April 21, 2026, Defendant was charged with seventeen others via Criminal Complaint. Before issuing that complaint and the attendant search and arrest warrants, Judge Joseph reviewed an affidavit spanning over a hundred pages. The charges against Defendant and his co-conspirators were based on an extensive investigation of at least three related DTOs dating back to May 2024 and performed by Homeland Security Investigations (HSI), Internal Revenue Services (IRS), Wisconsin Department of Justice – Department of Criminal Investigation (DCI), West Allis Police Department (WAPD) and others.

Defendant appeared before Judge Joseph for a detention hearing on April 27, 2026. Based on a voluminous record, Judge Joseph found that Defendant rebutted the presumption, but that detention was nevertheless appropriate because Defendant posed a significant danger to the community. (ECF 77, 120).[3] On May 5, 2026, a Grand Jury indicted Defendant, and his co-conspirators, in a Thirty-Three Count Indictment charging Defendant with three counts of Conspiracy to Distribute Controlled Substances based on his involvement with three separate DTOs, Conspiracy to Maintain a Drug House, four counts of Maintaining a Drug House, one count of Conspiracy to engage in Money Laundering and two counts of Money Laundering. (ECF 102). Each of the eight charges related to Defendant's drug trafficking enterprise creates a rebuttable

---

[3] Defendant makes much of the fact that the detention order "explicitly did not find" that his release would pose a danger to the community. (ECF 104, p. 5). Though it is true that the *box* related to dangerousness was not checked, the entire basis of Judge Joseph's order was that Defendant posed a risk of danger to the community that could not be mitigated. And, on the record, Judge Joseph made that finding explicit: "I do find that the government has met their burden that you pose a danger to the community." (Hr'g Trans., p. 36:24-25).

presumption of detention based on dangerousness to the community. And Defendant faces a significant mandatory minimum of ten years on Count Two.

Defendant now moves this Court to revoke Judge Joseph's well-reasoned detention decision based on his "deep roots in the community, negligible criminal history," lack of weapon possession, and cooperation with law enforcement. Defendant presents no new evidence to support his release. The evidence that does exist conclusively refutes his arguments, shows that he remains a significant danger to the community, and supports Judge Joseph's decision here.

### III. Argument

#### A. The Nature and Circumstances of the Offense - Defendant's Long-Running Drug Trafficking Enterprise

Defendant's crime is among the most serious offenses prosecuted in this District. For years, Defendant has victimized and terrorized the southside of Milwaukee through a sophisticated and dangerous drug trafficking enterprise, while successfully evading detection by hiding behind the very business and "lack" of criminal history on which he now relies to argue for release. Defendant styles himself as a do-gooder who simply provides community members who have "very little assets and nowhere else to go" with "affordable, accessible" places to safely reside. ECF No. 120, 18 ln 5 -7. That is certainly the façade that Defendant has historically presented to the community and law enforcement. And it is what has allowed Defendant to avoid law-enforcement scrutiny, assist co-conspirators in evading detection, and profit to the tune of millions while innocent victims of the drug trade, and attendant violence, suffer. The reality, as demonstrated by this investigation and detailed in the Criminal Complaint (ECF 103), Defendant uses his real estate business to provide rentals not to down-

on-their-luck community members, but to drug traffickers who prey on the most vulnerable members of our society. To support his operation, Defendant has used violence and intimidation, assisted drug traffickers to distribute deadly drugs, and lied to law enforcement to manipulate the justice system in an effort to avoid consequences for himself and co-conspirators. Though extremely serious in their own right, the specific charges, and corresponding mandatory minimum, Defendant faces actually underplays the nature and circumstances of this offense. This factor weighs extremely heavily in favor of Defendant's continued detention.

The instant investigation began with an overdose death in May 2024. (ECF 103, pp. 73-74) That overdose was ultimately connected to Russell McDade, a co-conspirator to whom Defendant rented multiple properties for the purpose of drug trafficking. *Id.* The investigation expanded to cover three separate DTOs distributing cocaine and fentanyl throughout the southside of Milwaukee. During the pendency of this case, law enforcement seized over 1.5 kilograms of fentanyl, 3 kilograms of cocaine, 800 grams of marijuana, and 60 grams of methamphetamine. Just the amount of fentanyl seized during this investigation is enough to kill the entire population of Milwaukee and then some.[4] The connecting fiber of the three DTOs is the Defendant and his real estate business.

Defendant operates S2 Real Estate through at least 43 LLCs. (ECF 103, ¶ 59). He owns over 150 properties. *Id.* And though he certainly rents property to many law-abiding citizens, this investigation revealed that Defendant and his employees, like manager Jeanette Lopez,

---

[4] https://www.dea.gov/resources/facts-about-fentanyl (estimating that 1 kilogram of fentanyl has the potential to kill 500,000 people); https://www.census.gov/quickfacts/fact/table/milwaukeecitywisconsin/PST045224 (according to the United States Census Bureau Milwaukee had an estimated population of 562,407 people in July 2025).

also affirmatively sought out drug traffickers to whom they could rent properties located in areas heavily populated by drug users. Each of the DTOs at issue in this case rented properties from S2 Real Estate, with Defendant's express acquiescence and assistance Defendant and Lopez sought out drug traffickers specifically because renting to them generated additional rental income, provided free labor, and ensured a more reliable stream of income. *See* ECF 103. In other words, Defendant put an entire community at risk of violence, overdose, and death to satisfy his greed. See ECF No. 103.

### i.    Defendant Sought Out and Rented to DTOs

As described in the Complaint, Defendant rented properties to three separate DTOs for the purpose of drug trafficking. For example, with respect to the McDade DTO, Defendant provided at least five separate properties from which McDade and his associates could, and did, engage in drug trafficking. In July 2025, Defendant sent a confidential source (CS#2) to go to one of those properties – 1425 W. Greenfield – to fix surveillance cameras that were set up to protect the drug-trafficking business occurring there. ECF 103, p. 34, ¶ 69. CS#2 described seeing six males with semi-automatic firearms, an assault-style rifle, McDade cooking 250 grams of crack cocaine and a surveillance system with multiple camera screens monitoring the entire block – a system inconsistent with a legitimate residential property but perfectly consistent with protecting a drug stash house. *Id.* at p. 34-35, ¶¶ 69-70

McDade was ultimately arrested at 1425 W. Greenfield on October 15, 2025. ECF 103, p. 76, ¶ 164. When law enforcement executed a search warrant there, they found firearms, digital scales, drug ledgers, Naloxone, and thousands of hypodermic needles. *Id.* at p. 92, ¶ 209. Surveillance observed Defendant at that property just two months earlier. *Id.* at pp. 85-86, ¶ 191.

He had traveled there directly from another drug house he owned, and which McDade operated: 1512 South 21st Street. *Id.* While surveillance observed Defendant enter and exit the property, interact with McDade, and leave carrying a black bag they also observed significant drug related activity. *Id.* at pp. 84-86. Earlier, Defendant had paid CS#2 $2,000 to pick up a large, insulated pizza container secured with a lock from that house on 21st Street and deliver it to his residence in hales corners. *Id.* at p. 33, ¶ 67. Given the amount of money he was paid and the nature of the container, CS#2 reasonably believed that box contained drugs or cash. *Id.*

1512 South 21st Street was also the subject of a search warrant execution. That took place on September 23, 2025 – just over a month after Defendant was personally observed there. There too, law enforcement found firearms, drugs, digital scales, materials used to cook crack cocaine, naloxone and thousands of hypodermic needles. *Id.* at p. 87, ¶ 194. Defendant told law enforcement in his mirandized statement that he did not travel to his rental properties to pick up rent, and multiple witnesses have told law enforcement that they were present at 1512 S 21st Street and/or 1425 West Greenfield and that it was beyond obvious that these were drug houses. In other words, given his physical presence there (that had no legitimate explanation), Defendant very obviously knew, and was a part of, the drug trafficking occurring at the properties Defendant rented to McDade.

Indeed, Defendant's presence at McDade's properties was not a one-time occurrence coincidentally timed with law enforcement surveillance. Even before the search warrants and surveillance detailed above, on April 10, 2025, McDade and Defendant exchanged text messages in which McDade asked for "another unit for my aunt t" and the Defendant followed up confirming that he knew McDade was using Defendant's properties for drug trafficking: "Will it a a drug free house an activity?...Way too much activity at the house today. People in and out like crazy."

Page 8

Of course, this Court need not speculate about Defendant's knowledge or involvement in McDade's DTO. Defendant was captured, on audio, discussing it multiple times.

For example, on October 20, 2025, McDade contacted co-conspirator Alberto Boffil to place a three-way call to Defendant while McDade was incarcerated. During the call, Defendant stated to McDade, "Man, I gave you a heads up that…" and McDade spoke over Defendant and cut him, "Sam, Sam, quit talking over the phone." Defendant was unconcerned, both about McDade's arrest and about the potential of his getting caught, noting: "I'm not worried if you are going to say they are investigating me, it's always BS, so I'm not worried about it." He continued, "it's clearly not my business" and "it's a joke." The defendant then discussed with McDade the cover up on the operation.

> **STAIR**: Well whenever you gave me stuff it was for rent and...
> **MCDADE:** Yeah.
> **STAIR:** you gave me money and..
> **MCDADE:** Yeah.
> **STAIR:** receipts and..
> **MCDADE:** Yeah.
> **STAIR:** tools and whatever, so I don't know. This was all for rent, so...
> **MCDADE:** Yeah.
> **STAIR:** I mean, you told me you were, you had a place for your aunt…and the people your helping out. If your, you know, and we kind of done with that. If your having all that drama with these people, they're just going to have to all move out, so.
> **MCDADE**: Right.

In another call on March 2026, Defendant and McDade discussed their prior, profitable drug business and the possibility of Defendant assisting McDade to pay his bail:

> **MCDADE:** Y'know I– Y'know I– Y'know I'm good for it, Sam. Like, y'know I'ma take care of bi'ness [sic], y'know you gon' get your money with interest.
> **STAIR:** Yeah. [SNIFFLES]
> [VOICES OVERLAP]
> **MCDADE:** Like, I was your– I was your main partner, I was your guy, man.

**STAIR:**     Yeah.

During the call, McDade stated he would pay Defendant an additional $10,000, if Defendant posted bail.

That was far from the only time Defendant discussed his drug-trafficking enterprise on recorded calls. For example, in July 8, 2025, Defendant spoke with inmate William Meeuwsen, who was serving a sentence for First-Degree Reckless Homicide, Deliver Drugs, Kewaunee County Case Number 2020CF63.   During the call, Defendant discussed his current illegal drug trafficking conduct:

> **STAIR**:  Oh yea, that would be nice. I mean, the guys in there now are so bad. Like, we are pretty empty, because, you know, it used to be just drunks and regular folks, and now its the heroin addicts and they just, you know.
> **Inmate**:  Oh, they fold over and fall down. Yep.
> **STAIR**:  Yep. They don't pay a thing. They'll bring in 10 people. They, you know, constantly kicking them out. They can't seem to, you know, make their payment.  They get their money and owe their dealer too much. I don't know what it is, but.
> **Inmate**:  (Laughing) No don't.  I was going to say, you're better off getting the dealer to move in (laughing) and work through him. (laughing).
> **STAIR**:  I know (laughing).
> **Inmate:**  That's crazy (laughing). That's crazy (laughing). I got an idea. Let's find a couple guys.  Let's find a couple guys and make them a dealer.  (laughing).
> **STAIR**:  Yeah (laughing).
> **Inmate**:  No. Let's not.
> **STAIR**:  Wouldn't regret it. (laughing). Just kidding.
> **Inmate**:  Exactly. (Laughing). That's crazy though.
> **STAIR**:  You almost, you almost think someone would do that.  You know, set up.
> **Inmate**:  You know.

Defendant tried to play that conversation, and others like it, off as a joke. But the reality is that he was doing exactly what he described to inmate Meeuwsen. Indeed, between November and

Page 10

December 2025, Defendant and co-conspirator Lopez rented a stash house to CS#2. In conversations with CS#2, Lopez discussed providing stash and trap houses in locations with lots of drug activity, referenced McDade as an example of the success a drug dealer could have in those locations, and explained that Defendant would not present a problem for the drug trafficking activities. ECF 103, pp. 36-42. On December 4, 2025, Defendant took the rental money for the stash house rented to CS#2. During the interaction, Defendant and CS#2 discussed the rental location and payment. When CS#2 said he wanted "no paperwork" associated with the stash house, Defendant responded "We just need, I mean, I don't care, we just need their name and contact number and stuff," and suggested CS#2 use his own name. In response to CS#2 adamant opposition to using his name, Defendant laughed. Later Defendant just told CS#2 to make sure "they got money" and telling CS#2 not to "fail." *Id.* at p. 45, ¶ 95-96.

Later, Defendant was even more explicit with CS#2 about his drug trafficking conduct. For example, in early January 2026, the defendant and CS#2 discussed using violence to remove tenants from a location. During that conversation, Defendant asked CS#2 about the tenants' drug dealer: "Are they addicts? Like do we know their drug dealer? Can we talk to their drug dealer?" A few days later, the conversation continued:

> **STAIR**: And then, uh, we'll go from there. And then you think you can get those people out without drama?
> **CS#2**: Well, you know, yesterday you asked me something, I, I think I know who their drug dealer is. He is, uh, you know, he's a friend of my friend, you know, my good friend. How could that help?
> **STAIR**: Yeah, why don't you ask him and just, you know, just say, Hey, can you just move those folks along and then we'll, we'll keep an eye out or help you out in the future if you ever need any, you know, need any help or anything or need housing or, or something like that. Just say, you know, if he ever, we just need, you know, people to pay and if he ever needs housing for himself or his connections or people he knows we can help him out, do him a favor.
> **CS#2**: Oh, Okay.

> **STAIR**: You, you scratch my back, I'll scratch yours sort of thing, you know?
> **CS#2**: I got you. Okay, Sam. Alright.
> **STAIR**: And then if she, uh, guy, if he needs a little cash to move him along, we could do that too, because that's what I used to do. I had that security guy that was also a dealer and so he would go in and get rid of people, you know. Okay. So he wasn't, you know, they would move along for us and then we would just pay him security.

Law enforcement followed up on Defendant's offer to provide housing for the drug dealer in exchange for the dealer unlawfully evicting the tenants by introducing an undercover agent (UC) who pretended to be that dealer. In a phone call on January 21, 2026, Defendant outlined the way his drug trafficking enterprise operated, including the way he sets up drug traffickers with locations to store and sell drugs and how he warns them about law enforcement investigations. During this conversation, Defendant also acknowledged the drug trafficking business he did with both McDade and another co-conspirator, Martin Sinclair:

> **STAIR**: Well we had another guy that was, um, that was a provider that, uh, also did security for us. And so he would, he would know a lot of people he had to deal with to kick out of, you know, some of the basements. And he'd have some of his staff and stuff kind of clear out people for us. And then, um, you know, uh, and then he had, you know, we gave him, uh, you know, some units that he could rent and kind of manage out of. But you know, I think he went two outta control on that. And then he, you know, he got busted <laugh> because he was having too much activity, like going in and outta these places and, you know, you can't, you can't do that. And then there's certain ones that we like, you know, like, Hey, this is gonna be a place where there's no activity, you know, that you don't bring crack heads to or, you know, you know, and just be whatever. But you don't bring all those folks over there. And he was just bringing all these folks to all the places and it just, it backfired on him.
> **UC**: I got you. I know. I got you. Yeah. So you got, I mean, do you think like, like we do, you got a spot that I could look at like soon? I mean, I, I'm talking like, I, so I got, I had some shit going on in Madison. I was probably running a couple houses mm-hmm <affirmative>. And I'm, I'm kind of looking to move over here to Milwaukee area. I started, I started kind of moving shit over there. Like I, I'm kind of moving out of that area coming over here mm-hmm <affirmative>. And I'm looking to get like a, a spot and, and I was told that you're definitely the guy to talk to. So that's kind of more what to me was enticing to like mm-hmm <affirmative>.

About talking to you about trying to get a spot somewhere. And from what [CS #2] said is like south side is like your, where you roll.

**STAIR**: Yeah, pretty much. So like, um, I mean, we got a couple places open around fifth place, um, that's kind of open and I think there's a lot of activity over there and um, you know, if we had somebody that managed the unit well and didn't make a mess of it, you know, and just, uh, kept people away at, you know, whenever, you know, you just don't want to draw so much attention to it. Like this other idiot did.

….

**UC**: So, So you thinking, um, you thinking you got a spot there like in the next like, I don't know, couple of weeks that I can maybe

**STAIR**: Look at? I mean, there's some empty places now. I mean just, you know, come on like a normal renter and you know, you can come to the office and we'll show you some places and then you can kind of just rent it out yourself or whatever, or, um, and then just make sure you don't, you know, know, you keep it under control, you know.

**UC**: But are we talking like a house or like, like this got like multi-unit or shit?

**STAIR**: This one's, uh, those are duplexes. So there's a duplex over there. There's one that's like three levels. Um, so I think the duplex is the empty one right now.

**UC**: Alright. So All right. Upper, upper, lower shit. Like, I could, could I even stay? You're saying I could stay in the upper and I could work, work outta there as long as I don't go crazy Right. And I don't Right, right. Much.

**STAIR**: Yeah, that'd be perfect actually. Then you'd be, you know, in probably a good area and then, you know, probably don't draw attention there, you know, obviously go down the road or whatever and meet people or whatever, but <laugh>

**UC**: Yeah, right.

**STAIR**: But you know, because the other guy, that's what he screwed up is they, you know, they brought him right back there and then he knew where to find him. <laugh>.

….

**UC**: So like a guy like that you give him maybe a heads up?

**STAIR**: Um, if they give us a heads up, but they don't usually give us heads up <laugh> one. I mean, yeah, I mean, I, it's funny, the, I was given this, um, um, this one guy, you know, we, he rents a bar and we want the bar to kind of work, you know, and he's some stupid reason he is dealing out of the bar and he's like the bartender and the co-owner of the bar. And it's like, I called his wife and I'm like, you realize he's gonna get, they're gonna hit him sometime this in the next couple of weeks. You know, they came ask us who's there, who's the owner, blah, blah, blah. And it's like, are are you really that stupid that you're gonna bring that to your house and or to where you work? And then, you know, I mean, it's, it's just so

Case 2:26-cr-00094-BHL-SCD    Filed 05/15/26    Page 13 of 27    Document 150

stupid. And then like, doing so I don't know. We're worried he's gonna get, he's gonna get in trouble next and then, you know, he's gonna ruin his family's business. You know, I'd said, you know, just give it up for a couple months or, or do it elsewhere. You know, you shouldn't be, shouldn't be doing that in these places.

**STAIR**: Yeah, we got two places there that, you know, I mean, if we can, if we can just get some people paying the rent there, you know, then you could, you know, go collect rent and I can give you a little kickback for managing the place. And, and then whoever you want to put in there and maintain, you can, you know, at the, at the, at the park.

**UC**: Yeah. Like I put my people there and I know like, yeah, they ain't gonna get their shit unless they pay.

**STAIR**: Right, right,

**UC**: right. So it kind like works for both of us. I get it. Yeah.

**STAIR**: And then keep 'em under control so they don't draw attention. Like, I didn't one have a big fight or something. One of [CS#2] and one of [CS#2]'s units, and then the cops all came and busted the guys and got [CS#2] in trouble because there was, um, work in the building that needed to be done, and it was like a mess. SoI just gotta make sure that, you know, <laugh>, you get people to get along and don't cause drama.

**UC**: So you like Yeah, you do. You, you charge me, like, is there like a charge on me for like, like getting like a heads up? Like you, I mean, it sounds like you just want me to do some services for you every once in a while and we good, right?

**STAIR**: Yeah.

**UC**: I just wanna make sure, like, all right, all right. Yep. You know, right. This is like, yeah, you, this is next level thinking, man. <laugh> fucking, so you're a business man. Are you <laugh> he, like, he is a smart fucking business man. You should talk to him.

**STAIR**: Mm-hmm <affirmative>.

**UC**: All right. All right, man. Um, well, you got, you got my number. I'm gonna, I'm gonna be in touch. All right.

**STAIR**: Okay. Yeah. Keep me posted.

Over the next few days, the Defendant and UC discussed renting a drug location. Defendant also provided advice to the UC to prevent law enforcement detection, "Now this house will just be for folks crashing make sure no activity happens at this house or nearby we don't need drama." In early February, the Defendant and Lopez also discussed getting the "dealer" a location for his "base." Lopez expressed concerns with the area being "crack-head city" and that they will be breaking into the dealer's base [location to store controlled substances]. During the conversation,

Page 14

Lopez warned Defendant, "Sam! If [CS #2] talks to you, don't talk about any of that kind of stuff on the phone. [CS#2] wants to talk, 'You talk to me face-to-face.' 'Cause that…don't incriminate yourself, ever." Eventually, Defendant accepted the UC's money and rented the location to the UC, posing as a drug trafficker, on February 6, 2026.

Numerous witnesses have told case agents that Defendant cared about nothing but the money. And Defendant made no secret of the fact that his motivation to make more money took precedence over everything, including the law and the community. Indeed, in one post in 2025, Defendant boasted about all the money he was making from the drug dealers to whom renting:



### ii. Defendant Engaged in a Pattern of Manipulating the Justice System

In addition to partnering with DTOs to engage in drug trafficking and renting properties to drug traffickers specifically for the purpose of distributing deadly poison on the streets of Milwaukee, Defendant used his money, status, and business to evade detection, help others evade detection and manipulate the justice system. On one occasion, when law enforcement was conducting a check based on complaints of drug trafficking (among other things) at 1934 W.

Greenfield, the individuals there told law enforcement he had "Sam's" permission to be there. Then, he called Defendant, and Defendant gave the officer the (wrong) name of his "security" – "Russell McCarthy [McDade]. Defendant also admitted on jail calls to giving McDade a "heads up" about law enforcement action, told CS#2 to use a fake name for the stash house's paperwork; and he described to the UC how he had given another property tenant who ran a bar a warning about law enforcement action. That "warning" was also captured during the investigation and is described on pages 65-67 of the Criminal Complaint. ECF 103. In summary, West Allis Police Detective Nick Stachula engaged in an operation wherein he disclosed to Defendant a drug trafficking investigation into a property owned by Defendant that housed a bar in West Allis (Blaque Bar). Immediately after being told about the investigation, Defendant contacted Sinclair the operator of that bar, and Defendant's co-conspirator here. He warned Sinclair about a possible raid and told him to lay low.[5] Then, Defendant lied to Detective Stachula about knowing Sinclair or having his contact information.

In another intercept on April 7, 2026, the defendant admitted to warning a long-time drug traffickers at a properties on Chase about a raid.

| | |
|---|---|
| **LOPEZ**: | Yeah you can check both units. You can check the drug dealing unit in Chase, in 2346 Chase, how they left it. And then, um, [U/I] 'cause they're side by side. |
| **STAIR**: | That's so funny. They must've been like…either they, I don't know, they just left right off the bat. They probably thought they were gonna get hit next. |
| **LOPEZ**: | I know. They've been over there serving for a long time. |
| **STAIR**: | Yeah… |
| **LOPEZ**: | So… |
| **STAIR**: | So they're probably, like, out. Because I was honest with them. I said…yeah, I was kinda surprised. They hit…they warned us, and then they hit that place right away. |

---

[5] Sinclair confirmed he got this warning during a post-arrest *Mirandized* statement.

| | |
|---|---|
| **LOPEZ**: | And they're gonna hit you next. |
| **STAIR**: | And then they said you guys were next.  So I, I don't know.  And I said I don't care if you're dealing.  [LAUGHS]  I just don't like that you're- the tenants are noticing, at how obvious it is.  And then she was, she was like, "Ok."  [LAUGHS] |

Running multiple drug houses out of a business that presents itself as a legitimate property manager is dangerous enough. But the danger that Defendant creates in the city is multiplied significantly by the fact that he was able to use the very business he was operating to engage in drug trafficking to hide his own conduct and insulate his co-conspirators.

### iii.     Large Drug Quantities and Overdoses

Further demonstrating the serious nature of the offense at issue here are the deadly consequences that Defendant's activity has already had on the city. As noted above, this investigation began with an overdose death connected to McDade's DTO. Later, investigators learned of another overdose death that occurred at one of Defendant's properties – the 21th Street house described above – on September 19, 2024. ECF 103, p. 77, ¶ 168. Case agents have subsequently identified other overdoses related to the defendant's properties at 2327 W Michigan St, Milwaukee, WI; 729 S 21st St, Milwaukee, WI; 1027 S 26th St, Milwaukee, WI; 754 S Layton Blvd, Milwaukee, WI.

Defendant was not unaware of these risks. Indeed, around February 11, 2026, Defendant expressed concerns about a possible overdose at one of his properties.[6]  Defendant never contacted law enforcement regarding this possible overdose. Later, during a call on February 22, 2026, case agents learned that instead of checking on this vulnerable tenant, the defendant evicted her.

**Employee**:     "So she didn't die?"

---

6 This call was intercepted and the intercepted agents requested a welfare check.

**STAIR**: "Yeah, no. She was just, uh, running the crack house, basically. Well, I don't know. I don't think she was selling, she was just gettin'."

### iv. The Nature and Circumstances of Defendant's Offense Weighs Heavily in Favor of Detention

Drug trafficking offenses are inherently dangerous and serious. Indeed, Congress has singled out offenses like the ones with which Defendant has been charged as warranting a presumption of detention for that reason. But this offense, and specifically Defendant's involvement in it, is particularly so. Judge Joseph rightly focused heavily on that fact in finding detention warranted because the alleged conduct was "not a one-time thing, but conduct that went on for a long period of time." (Hrg. Trans. 35:2-3). That is, of course, not necessarily true of all drug trafficking offenses, but is true here. Moreover, Defendant was not a low-level participant in a typical, street-level DTO. Defendant placed himself at a "level of leadership" as the "head of a sophisticated operation" in which he "tipp[ed] others who were involved in this conduct and … use[d his] legitimate business to intermingle, if you will, with criminal activities." *Id.* at 35. And, Defendant's organization distributed serious drugs, in both type and quantity.

The nature and seriousness of the offense here supports detention.

### B. *The Weight of the Evidence is Strong*

Defendant takes issue with Judge Joseph's decision because he argues that her reliance on the "weight of the evidence was misplaced." (ECF 104, p. 3). Indeed, this is the primary basis upon which Defendant rests his appeal – it takes up a full two pages of a five-page argument. But Judge Joseph did not rest her ruling on this factor. Instead, Judge Joseph spent most of her oral ruling discussing the nature and circumstances of Defendant's offenses and how he posed a danger that could not be mitigated. In fact, Judge Joseph said very little about the weight of the evidence –

Page 18

mentioning it only in three sentences of her oral findings. (Hrg Trans. 12: 9-16). All she said was that it is a factor that is typically strong in federal cases, but stronger here because of the nature of the investigation, which included physical and electronic surveillance, cooperators, witnesses, and numerous business and financial records. *Id.* Thus, far from resting the decision on this factor, Judge Joseph applied it in exactly the way Defendant suggests: She noted that it favored detention and moved on because, as she indicated, it nearly always does.

Of course, that factor does weigh heavily in favor of detention given the wealth of evidence, including Defendant's own words, amassed in this case. That evidence has only gotten stronger since the initial detention hearing and subsequent indictment, and it favors detention.

## C. The History and Characteristics of the Defendant

Defendant asserts that his history and characteristics favor release because he has no recent criminal history. At first glance, Defendant's background might support that view given his education, employment, and lack of criminal history. But that high-level view of Defendant is the same façade that has allowed him to evade law enforcement, and continue to endanger the community, for as long as he has.

The reality is that Defendant is not the law-abiding citizen he purports to be. Instead, he has used his standing in the community and the money he has earned to engage in dangerous conduct. He has demonstrated himself as sophisticated enough to manipulate police investigations, and knowledgeable enough to surround himself with perceived untrustworthy, criminals and unreliable drug addicts. Moreover, the stable employment on which Defendant relies for his positive characteristics is also the job that allowed him to commit the instant offenses.

Ultimately, Defendant's positive characteristics helped, rather than stopped, him from endangering the community and this factor, too, weighs in favor of detention.

### D. Defendant Continues to Pose a Danger to the Community

Many of the factors of the detention test are backward looking, but the last one looks forward and asks the Court to evaluate the nature and seriousness of the danger Defendant poses to any person or the community. Defendant poses an acute risk of endangering the public through continued drug trafficking. Congress chose to apply the presumption of detention set out in Section 3142 to the very drug trafficking offense with which the defendant is charged. Congress did so because such crimes not only endangered individuals but also, more generally, *the community* – i.e., not only is violence inherent to drug trafficking, drug trafficking itself is dangerous to the community for purposes of the statute.

> The concept of defendant dangerousness is described throughout this chapter by the term 'safety of any other person or the community.' The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, *while the language referring to the safety of the community refers to the danger the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence* . . . . The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.'

*United States v. Dominguez*, 629 F. Supp. 701, 707 (N.D. Ind. 1986) (citing 1984 U.S. Cong. Code & Admin. News, pp. 3195–6); *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1986); *United States v. Hawkins*, 617 F.2d 59 (5th Cir. 1980), *cert. denied*, 449 U.S. 952 (citations omitted) (emphasis added).

Thus, large-scale drug trafficking itself, without any independent indicia of violence, endangers the community within the meaning of dangerousness as used in Section 3142 and carries

Page 20

the associated presumption of detention. As explained by the Seventh Circuit, "in creating this presumption, Congress determined that the type of drug trafficking alleged in this indictment is a serious danger to the community. Especially significant is the drug network's ability to continue to function while the defendant awaits trial." *Portes*, 786 F.2d at 764–65.

In this case, the danger that Defendant poses to the community is exceedingly high. Not only did he engage in large quantities of dangerous substances, but he used his position and status specifically to thwart law enforcement. Moreover, though Defendant claims that he poses no danger due to his lack of firearm possession, the reality is that Defendant's conduct involved not only drug trafficking, but also violence. Finally, and perhaps most importantly for this factor, Defendant was wholly undeterred by multiple, escalating police actions, and has continued to engage in criminal activity since his arrest.

### i. Defendant's Violence

Defendant asks this Court to order his release in part based on an argument that he is not dangerous, pointing to the fact that he does not possess firearms. Such an argument wholly ignores that Defendant does not need to possess firearms or engage in violence himself because he explicitly employs others to do so on his behalf. This investigation has shown that when money would not buy compliance, Defendant sought violence to get his way. Indeed, Defendant employed the drug dealers to act as "security." Witnesses have repeatedly told law enforcement that the role of "security" was to "evict" problematic tenants, often through violence. And, like he did with respect to his drug trafficking conduct, Defendant was explicit about the violence he solicited on recordings.

For example, on January 5, 2026, while discussing removing tenants by involving the tenants' drug dealer, Defendant stated to CS #2, "driving them out, talking to their drug dealer or find out when they're not there. I'll send Tracy over, threaten the fuck, fuck out of him. And then maybe they won't come back or…" and "I just say, hey, we're gonna send on a crew here to say, hey, I worked with them, blah blah blah. They're gonna send a crew down here and kick the shit outta you guys and drag you out. If you guys aren't out by the weekend, what's your plan? You gonna stay or leave?" Similarly, in April 2026 when he explained there were two options for "security", the harder one "the proper process" calling the police, or "… you need to start bringing a baseball bat and or somethin'. And…and fuck some of these guys up, so they don't come back or…"

And on January 21, 2026, the defendant talked to his new "security." Defendant discussed "pistol whip[ping]" another person and "just say he looked Mexican." Defendant was also told that people believed "security" had real guns, but in that case, it was a BB gun. The defendant responded, "Don't tell our people." Moreover, many of Defendant's co-conspirators carried real guns and stored them in Defendant's properties. Indeed, during the investigation, law enforcement seized 18 firearms, including a machine gun. And Defendant knew that guns were involved in his drug trafficking – he was physically present at properties in which witnesses described seeing multiple firearms in the open and law enforcement routinely surveillance captured Defendant's co-conspirators (like McDade) visibly carrying firearms.

These conversations were not theoretical. During the investigation, case agents responded several times to violent and dangerous incidents during the court authorized intercepts of the DTO. For example, on January 9, 2026, case agents intercepted calls in which Lopez and other DTO

members were being sent as "security" to Otis Lockett's trap house, located at 829 South 19th Street.  During the interceptions, case agents learned Lopez and another person brought "bats" but not her "hit" [firearm] to beat up the individuals. Lopez was captured during the attack yelling "you bitch" "you bitch" "you coming in this motherfucker" "I aint playing with you bitch".  In a later interception, the defendant bragged how Lopez would attack people and he offered another employee "$50 bucks a head."

That Defendant himself did not carry a firearm or engage in this violence makes him no less dangerous to the community. He is clearly willing and able to use his vast resources and position to solicit others to do that for him. As such, he poses a danger to the community.

> ii. **Defendant Endangered Innocent People to Whom he Rented Even Apart from His Drug Trafficking and Violence.**

The danger Defendant poses to the community extends beyond only those harmed by his drug trafficking or "security" operations. For example, in early February 2026, one of Defendant's properties managed, 4800 West Hampton, had a fire and We Energies turned off the power and gas to the building for safety reasons.  The City of Milwaukee ordered that no one reside in the building. Defendant, while in Mexico, instructed employees to disobey the City's order.

Between February 6, 2026, and February 9, 2026, Defendant attempted to illegally connect power and gas to the building. When his employees warned this would create more damage and risk, Defendant said he did not care. He directed them to forget the dumb guy [city inspector] and "they" [city inspector] cannot tell them what to do. In other calls, he directed employees to tap into breakers and run cables to use heaters, and to drill out the gas line and get the furnaces running. When an employee told the defendant that it would be dangerous for the people there, Defendant ignored the warning and said no one would notice the cable.  Defendant also told the employee to

cut the locks off the gas meters and said that he would claim ignorance and blame it on the tenants if the city raised questions about that. During these communications, Defendant explicitly discussed not putting his illegal conduct in text messages and told employees to undo the illegal connections when the electrical inspector comes.

### iii. Defendant was wholly undeterred by multiple, escalating police actions

Perhaps most concerning for the evaluation of whether Defendant continues to pose a danger to the community if he is released is the fact that despite multiple close calls with law enforcement, the execution of "raids" at various of his properties, and explicit warnings from his co-conspirators, Defendant was totally undeterred and continued his illegal conduct.

As explained above, law enforcement executed search warrants at two of McDade's properties one month apart. Defendant was undeterred – he continued his enterprise. Defendant was told by Detective Stachula that law enforcement was investigating Blaque Bar. Defendant was undeterred – he warned Sinclair and continued his unlawful activity. In another call he told another tenant that he did not care if they were dealing drugs, but that they were going to get "raided."

In April 2026, while the defendant was seeking someone to physically attack people, he also discussed obtaining a large amount of controlled substances and selling them out of his property on "5th Street" with his workers.

| | |
|---|---|
| **EMPLOYEE 1** | Wanna make some money? |
| **STAIR** | Big money? |
| **EMPLOYEE 1** | I'm, I'm gonna get the product and then I'm just… they're there, I'm just gonna sell it to 'em and I'll break you off a cut. [LAUGHS] |
| **STAIR** | [LAUGHS] |
| **EMPLOYEE 1** | Fuck it, they're gonna be there. They're gonna be there… [VOICE OVERLAP] |
| **STAIR** | You know what we should do is… [VOICE OVERLAP] |

Page 24

| | |
|---|---|
| **EMPLOYEE 1** | … then might as… |
| | [VOICE OVERLAP] |
| **STAIR** | … we can funnel them to some building we don't care about, y'know, like uh… on Fifth (5th) Street… and suddenly like, "Oh, yeah, come on pick up here." |
| **EMPLOYEE 1** | Shit. [LAUGHS] |
| | [VOICE OVERLAP] |
| **STAIR** | And then they'll all be there. |
| **EMPLOYEE 1** | [BACKGROUND: UM: (U/I) could like, could like (U/I).] Yeah! Yeah! I'll break you off a cut. [GIGGLES] |
| **STAIR** | Yeah, maybe we can make it like a big crack house, where we can just uh, charge them like fifty (50) bucks a night to stay, twenty-five (25) bucks a night to stay. |
| **EMPLOYEE 2** | There you go. |
| **STAIR** | Uh, we, product included. [CHUCKLES] |
| **EMPLOYEE 2** | There you go. [LAUGHS] |

During this conversation, Defendant expressed a recognition that he could end up in federal prison or engaged in gun violence with other drug traffickers. Defendant was undeterred – he continued his criminal enterprise. Defendant learned of overdoses, was told explicitly not to talk on the phone or to certain people, was warned not to incriminate himself, and in general, has numerous extensive warnings that what he was doing was likely to engender law enforcement action against him. Defendant was entirely undeterred. This Court has held that continuing to engage in criminal conduct despite law enforcement scrutiny and interaction weighs heavily in favor of detention because of the continued risk of harm. *United States v. Valle-Rivera*, 2024 WL 3183139, *7-9 (E.D. Wis. June 26, 2024). Certainly, this factor weighs heavily in favor of detention here.

### iv. Defendant has continued his criminal activity after arrest

As indicated above, at least one witness has told law enforcement that Defendant reacted to his arrest in the instant case by noting that it would be good for the "show" – referencing a television show he was considering filming about his real estate business.

Case agents have also reviewed Defendant's jail calls and there are real concerns the defendant is attempting to obstruct justice. Case agents have identified that Defendant requested individuals to place money on the books of co-defendant Jermaine Erving, identified as McDade's Chicago drug source, as well as the books of a related defendant, George McFarland's. Defendant admitted that McFarland, a federal indicted fentanyl drug trafficker, lived at or had a connection to Defendant's properties. Law enforcement has reason to believe Defendant has also used the PIN number of others housed with him and are currently reviewing those calls.

Case agents located another call in which Defendant is discussing fellow co-defendants not being released. Defendant stated, "I mean maybe this is their time if they really help me out I'll help some of these people get houses." Case agents are investigating this matter more, but it appears Defendant is attempting to obstruct justice through his wealth and resources.

Defendant also reached out to a real estate broker and discussed placing some of his other property funds into a separate account to avoid "tainting" the money. Defendant also discussed with his wife having money come into a new company account that will "unlock" the fund from his business. And Defendant identified a new LLC as S2 Real Estate Florida. Given the Grand Jury's findings regarding forfeiture in this case, these conversations are a clear attempt to evade the government's ability to seize drug-and-money-laundering property.

And, perhaps most concerning is the fact that Defendant has sought out updates on his codefendants, possible cooperators, and confidential sources. He has admitted that he was warned over a year ago that the "feds want you." And, he has discussed getting paid cash by a guy [believed to be McDade] and that it was an attempt to entrap him. Defendant also discussed how his business grew too fast and people took advantage.

Page 26

Given the inability of significant law enforcement action to deter Defendant, his willingness to engage in violence, and his efforts at obstruction after arrest, it is clear that Defendant poses a risk to the community if he is released.

### IV.      Conditions Will Not Mitigate the Risk to the Community

Historically, the only time Defendant appears to not endanger the community, is currently, when he remains in custody.  The nature of the conduct in which Defendant has engaged, his leadership role in the organization, and his historical ability to use his resources and status to avoid detection make it such that there are no set of conditions that could adequately mitigate the danger he poses to the community. Indeed, the fear of being federally investigated, having co-actors charged in state court, and witnessing or learning about multiple search warrants executed at his properties did nothing to stop him. Defendant has demonstrated a brazen disregard for authority, and the law. At every turn he has disregarded both and continued to endanger people, and then lie about his conduct, as long as doing so makes him more money. There is, therefore, little reason to believe that there are any conditions that could sufficiently mitigate the danger he poses.

## III. Conclusion

The United States respectfully requests that the Court deny Defendant's motion for the pretrial release and affirm Magistrate Judge Joseph's detention order.

Respectfully submitted this 15th day of May, 2026.

By:      *s/ Katherine M. Halopka-Ivery*
Katherine M. Halopka-Ivery
Julie F. Stewart
Assistant United States Attorneys